IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-262-ELG |
| | ) | (Chapter 11) |
| JPK NEWCO LLC | ) | |
| | ) | |
| Debtor. | ) | |

**OPPOSITION OF WCP FUND I LLC TO THE UNITED STATES TRUSTEE'S
MOTION TO DISMISS CHAPTER 11 CASE PURSUANT TO 11 U.S.C. § 1112(B)**

Maurice B. VerStandig, Esq.
Bar No. MD18071
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com
*Counsel for WCP Fund I LLC*

## <u>TABLE OF CONTENTS</u>

I.    Introduction ........................................................................................................ 1

II.   Verified Statement of Relevant Facts ................................................................ 3

     a.   Real Estate Loans and Defaults ................................................................ 3

     b.   Litigation & Mediation ............................................................................ 4

     c.   Formation of a Special Purpose Entity .................................................... 5

     d.   JPK Business Operations .......................................................................... 6

     e.   Allegations of Wendell Webster and Charles Paret .................................. 7

     f.   Removal of Litigation .............................................................................. 9

     g.   Posture of Consolidated Litigation at Time of Removal ........................... 9

     h.   Filing of Involuntary Bankruptcy ........................................................... 10

III.  Argument: This is Not a Bad Faith Bankruptcy ............................................... 11

     a.   Adoption of the Fourth Circuit Standard Would Require the Motion be Denied ...... 13

        i.   This Case is Not Objectively Futile ....................................... 15

        ii.   This Case is Not a Byproduct of Subjective Bad Faith ......................... 17

        iii.   This Court Should Adopt the *Bestwall* Standard ................................... 19

     b.   Adoption of the Third Circuit Standard Would Also Require the Motion be Denied ........................................................................ 21

     c.   A Totality of Circumstances Analysis Would Also Require the Motion be Denied ........................................................................ 25

     d.   The UST's Cited Case Law in Inapposite .............................................. 28

     e.   Amicable Involuntary Filings are Not Bad Faith Proceedings ................ 30

IV.   Argument: The Debtor is Not Required to Carry Insurance or, Alternatively, the Absence of Insurance is Due to Unusual Circumstances .................................. 32

V.    Conclusion ...................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*,
589 F.3d 605 (3d Cir. 2009)........................................................................................ 22

*Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC)*,
71 F.4th 168 (4th Cir. 2023) ................................................................................ *passim*

*Carolin Corp. v. Miller*,
886 F.2d 693 (4th Cir. 1989) ............................................................................... *passim*

*Coleman v. Cmty. Tr. Bank (In re Coleman)*,
426 F.3d 719 (4th Cir. 2005) ................................................................................ 20, 21

*Duggan v. Highland-First Ave. Corp.*,
25 B.R. 955 (Bankr. C.D. Cal. 1982)............................................................................ 26

*Emp. v. AIG Fin. Prods. Corp. (In re AIG Fin. Prods. Corp.)*,
2024 U.S. Dist. LEXIS 155142 (D. Del. Aug. 28, 2024) ............................................ 24

*In re Aldrich Pump LLC*,
2023 Bankr. LEXIS 3043 (Bankr. W.D.N.C. Dec. 28, 2023) ..................................... 17

*In re Crown Fin.*,
183 B.R. 719 (Bankr. M.D.N.C. 1995)................................................................... 29, 30

*In re Dixie Broad., Inc.*,
871 F.2d 1023 (11th Cir. 1989) ................................................................................... 29

*In re Franklin Mortg. & Inv. Co.*,
143 B.R. 295 (Bankr. D.D.C. 1992) ..................................................................... *passim*

*In re HBA E., Inc.*,
87 B.R. 248 (Bankr. E.D.N.Y. 1988).................................................................... 28, 29

*In re Kingston Square Associates*,
214 B.R. 713 (Bankr. S.D.N.Y. 1997).............................................................. 2, 31, 32

*In re Little Creek Dev. Co.*,
779 F.2d 1068 (5th Cir. 1986) ..................................................................................... 26

*In re LTL Mgmt. LLC*,
2024 U.S. App. LEXIS 18437 (3d Cir. July 25, 2024)...................................................... *passim*

*In re Mi La Sul*,
380 B.R. 546 (Bankr. C.D. Cal. 2007)................................................................... 31, 32

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999)................................................................... 23, 24

*In re Sgl Carbon Corp.*,
233 B.R. 285 (D. Del. 1999)................................................................... 29

*In re Thirtieth Place, Inc.*,
30 B.R. 503 (9th Cir. BAP 1983)................................................................... 17

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*
*(In re LTL Mgmt., LLC)*,
 64 F.4th 84, 108 (3d Cir. 2023) ................................................................... *passim*

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
*(In re Integrated Telecom Express, Inc.)*,
384 F.3d 108 (3d Cir. 2004)................................................................... 22

*Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*,
52 F.3d 127 (6th Cir. 1995) ................................................................... 26

*U.S.I. Props. Corp. v. M.D. Constr. Co.*,
860 F.2d 1 (1st Cir. 1988)................................................................... 14

**Statutes**

11 U.S.C. § 362................................................................... 11

11 U.S.C. § 1112................................................................... 1, 32, 34

28 U.S.C. § 1334................................................................... 14

D.C. Code § 28:3-309 ................................................................... 33

**Rules**

Federal Rule of Civil Procedure 65 ................................................................... 33

Federal Rule of Evidence 408................................................................... 5

**Treatises**

7 Collier on Bankruptcy P 1112.04.................................................................................................. 33

Comes now WCP Fund I LLC ("WCP"), the largest equity holder of JPK NewCo LLC ("JPK" or the "Debtor"), by and through undersigned counsel, in opposition to The United States Trustee's Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b) (the "Motion," as found at DE #37), and states as follows:

## I.      Introduction

The United States Trustee (the "UST") urges this case should be dismissed for three reasons: (i) an entity created to harbor troubled assets, with cognizance a bankruptcy may follow the entity's creation, ought to be ineligible for relief under Title 11 of the United States Code (the "Bankruptcy Code"); (ii) an involuntary bankruptcy commenced in a non-hostile fashion is an act of bad faith irreparably poisoning the ensuing proceeding; and (iii) JPK does not possess insurance for the two secured promissory notes, one unsecured promissory note, and modest sum of cash, that collectively constitute the entity's assets. Each of these assertions is misguided as a matter of law.

The UST appears particularly disturbed by the notion that an entity may be created with cognizance of the tools made available through the Bankruptcy Code. This concern is surprising for myriad reasons, not the least of which being that the UST—as the executive branch's emissary to bankruptcy courts—is designed to be more a proponent of the Chapter 11 process than a rigidly zealous advocate of exclusionary policies. More substantively, however, the surprise does, too, stem from the reality that no matter what recognized test may be applied in this judicial circuit, or in this case, the JPK bankruptcy is *not* a bad faith filing. This Honorable Court could adopt (a) the Fourth Circuit standard recently reinforced in the matter of *Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th 168 (4th Cir. 2023); (b) the Third Circuit standard recently refined in the cases of *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to*

1

*Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 108 (3d Cir. 2023) ("LTL I") and *In re LTL Mgmt. LLC*, 2024 U.S. App. LEXIS 18437 (3d Cir. July 25, 2024) ("LTL II"); (c) the standard used by this Honorable Court more than thirty years ago in the case of *In re Franklin Mortg. & Inv. Co.*, 143 B.R. 295 (Bankr. D.D.C. 1992); or (d) the "totality of the circumstances" standard suggested by the UST (which, as discussed *supra*, closely—if not entirely—mirrors the *Franklin Mortgage* standard). While JPK advocates herein the Fourth Circuit standard, such is immaterial: under any of the tests, this case does not meet the rigors of a bad faith filing and, as such, is not meritorious of dismissal.

The Motion is equally perplexing in focusing on the putatively-friendly nature of the involuntary petition underlying this case. The UST cites directly to *In re Kingston Square Associates*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997), the marquee case on point that makes abundantly clear even a collusive involuntary filing can be permissible when a debtor is otherwise incapable of seeking bankruptcy relief. Yet somehow the UST looks past the fact that JPK was assuredly eligible to itself petition for bankruptcy relief and, as such, enters bankruptcy through an involuntary mechanism that is per se allowable and not even within the subjective realm addressed by the *Kingston* Court.

No less strange is the UST's final contention concerning insurance. JPK's assets are three promissory notes, a small sum of money on deposit with a bank, and cash held in an attorney's trust account; none of these are assets of a readily insurable variety and, as such, it comes as little surprise that no policies of insurance are presently maintained. If the UST means to point to the real estate assets serving as collateral for two of those promissory notes, it bears emphasis that such are *not* assets of JPK and that the owners of the two properties are themselves obligated to insure the real estate and structures pursuant to deeds of trust securing those notes. JPK is presently

enjoined from foreclosing on those two notes; assuredly the UST is not arguing that one of numerous ongoing breaches on the part of the borrowers, which informs the need for JPK to reorganize in the first instance, is also grounds to deny JPK access to Chapter 11.

JPK has just under $2.5 million in assets and faces disputed, contingent, and unliquidated liabilities of a comparable sum. Because of ongoing litigation, JPK is unable to monetize its two largest assets so as to pay debts as they come due. JPK has at least three alleged creditors, is a participant in the local lending industry, and can efficiently reorganize with the tools provided for in the Bankruptcy Code. All of which rather strongly makes JPK a textbook candidate for Chapter 11, and all of which makes the Motion rather perplexing. The UST seems to believe an entity cannot seek bankruptcy relief unless it has been in existence for some ill-defined amount of time, but Congress did not affix a "must be this old to ride" sign to the Bankruptcy Code and case law firmly holds no such condition precedent to reorganization exists.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged the Motion be denied.

## II.    Verified Statement of Relevant Facts[1]

### a.   Real Estate Loans and Defaults

1.    In December 2021, WCP loaned $4,103,000.00 to Developer RE1 LLC ("DRL"), with the subject loan being memorialized by two promissory notes in the respective sums of $3,579,000.00 and $524,000.00 (the "DRL Notes").

---

[1] As noted *supra*, the Motion ultimately fails on purely legal grounds. Since the UST has announced an intent to pursue discovery in this matter, an extensive factual recitation—verified by the principal of WCP—is included herein, with the transparent design of avoiding any factual inquiries or disputes. So while it is certainly the UST's prerogative to exercise its rights under the Federal Rules of Bankruptcy Procedure, this factual recitation is designed to minimize—if not outright eliminate—any areas of factual ambiguity and, thereby, eliminate any legitimate need for the taking of discovery.

2.      The DRL Notes are both secured by deeds of trust (the "DRL Deeds of Trust") on the real property commonly known as 5501-5505 1st Street, NW, Washington, DC 20011 (the "DRL Property").

3.      Similarly, in March 2022, WCP loaned $9,945,693.00 to 423 Kennedy St Holdings LLC ("423 Kennedy"), with the subject loan being memorialized by two promissory notes in the respective sums of $8,689,693.00 and $1,256,000.00 (the "423 Kennedy Notes")

4.      The 423 Kennedy Notes are secured by deeds of trust (the "423 Kennedy Deeds of Trust") on the entity's eponymous property (the "423 Kennedy Property").

5.      Both DRL and 423 Kennedy repeatedly defaulted under their respective notes and deeds of trust by, *inter alia*, allowing senior liens to accrue on the entities' properties, failing to make interest payments in a timely manner, and failing to pay any of the four—let alone all four—notes at maturity.

### b.  Litigation & Mediation

6.      DRL and 423 Kennedy do not believe their various breaches were sufficiently severe to warrant defaults being declared and foreclosures being scheduled, so they each brought suit to enjoin those foreclosures, alleging the declared defaults to have amounted to tortious interference with their business relations.

7.      The two respective complaints are colorful in nature, with one expressly alleging that "Money is the Root of All Evil," and one accusing WCP of corruption.

8.      In light of the two complaints and correlative motions for injunctive relief, the District of Columbia Superior Court entered injunctions prohibiting the defendants from foreclosing on the DRL Deeds of Trust and the 423 Kennedy Deeds of Trust.

9.      Following the entry of these injunctions, all parties agreed to mediate before a retired Superior Court judge, with DRL and 423 Kennedy sharing a common principal (albeit not having purely overlapping equity membership).

10.      During the course of two formal mediation sessions, certain potential resolutions were discussed whereby 423 Kennedy and/or DRL would release claims in exchange for participating in a share of loan profits.[2]

11.      As part of the aforesaid negotiations, WCP introduced the idea of transferring certain promissory notes into a so-called "special purpose entity," so ownership interests in the negotiable instruments could be ultimately divided pursuant to a settlement agreement without (i) having to sever the notes themselves into multiple pieces; and/or (ii) needing to offer DRL and/or 423 Kennedy an ownership interest in WCP or any of its co-defendants.

12.      The two formal mediation sessions were held with a retired judge on January 9, 2024 and January 25, 2024.

**c. Formation of a Special Purpose Entity**

13.      Shortly following the second mediation session, WCP and SF NU, LLC ("SNL") formally created JPK, with the entity being registered on February 1, 2024.

14.      JPK was created on the advice of counsel, with then-present cognizance the entity could be used to either facilitate an amicable resolution to the pending litigation and/or as a mechanism of siloing troubled assets so as to remove those assets, and their accompanying putative liabilities, from the balance sheets of WCP and SNL.

---

[2] For the avoidance of doubt, this statement is *not* offered to "prove or disprove the validity or amount of a disputed claim," Fed. R. Evid. 408(a), and, to the contrary, WCP and WCP's co-defendants in the subject litigation strongly deny any and all liability. Rather, these discussions are shared to offer a complete contextual understanding of how JPK came into existence.

15.     Specifically, insofar as a good faith analysis of the claims in the litigation reveals relief to be sought in the form of an *in rem* setoff against liability due and owing on the four promissory notes, transferring the two junior notes into a separate entity effectively serves to firewall any liability from reaching WCP or its various co-defendants.

16.     While WCP and its co-defendants remain liable for any damages that may exceed a setoff of the two notes held by JPK, reasoned analysis of the subject litigation suggests it is exceedingly unlikely liability could extend to such a level.

17.     At the time JPK was formed, there existed a cognizance that the entity may seek bankruptcy protection should settlement efforts fail.

18.     JPK is not a Texas limited liability company and was not formed pursuant to a so-called "divisional merger" of WCP and/or SNL, but JPK's creation does resemble what is colloquially known as a "Texas Two Step" insofar as JPK absorbed assets carrying alleged *in rem* liability and thereby siloed the likely reach of the subject claims from the balance sheets of WCP and SNL, with WCP and SNL creating a new entity focused on addressing multiple litigation claims and thusly likely sheltering WCP and SNL from the ultimate economic reach of the subject litigation claims.

### d.  JPK Business Operations

19.     JPK was capitalized by WCP and SNL through contribution of the two junior promissory notes and assignment of the correlative deeds of trust, with membership interests being given as consideration for the contribution of the promissory notes.

20.     The formation and capitalization of JPK is reflected in the entity's operating agreement.

21.     Following its formation, JPK needed funds to engage counsel and operate, with the
expectation JPK would be joined in the litigation then-pending in the Superior Court.

22.     To procure such funds, JPK borrowed $50,000.00 from a third party.

23.     The third party lender was advised that JPK may use part or all of the loan proceeds
to engage counsel, including the potential engagement of insolvency counsel; the third party was
not misled as to the very distinct potential of JPK seeking to reorganize in bankruptcy.

24.     A portion of the loan proceeds were transferred to the IOLTA account of WCP's
litigation counsel, to be held pending anticipated engagement to represent JPK in the litigation.

25.     The remaining loan proceeds were loaned to an unrelated third party in an effort to
make a profit from interest (as a company owned by lenders would be wont to do).

26.     JPK's borrowing funds from a third party, and lending funds to a third party, were
both done on the advice of counsel, albeit with JPK's manager exercising discretion as to the third
parties with whom said transactions were undertaken.

27.     Should JPK recover monies from the loan extended to a third party, or the two
secured promissory notes with which JPK was capitalized by WCP and SNL, JPK would be able
to use such funds in future business operations, including through the making of new loans to third
parties in the District of Columbia metropolitan area.

### e. Allegations of Wendell Webster and Charles Paret

28.     Charles Paxton Paret ("Mr. Paret") is a Chapter 7 debtor in this Honorable Court.
*See In re Paret*, Case No. 23-217-ELG (Bankr. D.D.C. 2023) (the "Paret Main Case").

29.     In connection with the administration of Mr. Paret's bankruptcy estate, Wendell
Webster, the Chapter 7 trustee ("Mr. Webster"), has filed an adversary complaint against DPCL,

WCP, and Mr. Huertas. *See Webster v. Huertas, et al.*, Case No. 23-10025-ELG (Bankr. D.D.C. 2023) at DE #39-1 (the "Webster Complaint").

30.    The Webster Complaint was filed in July 2024—more than five months *after* JPK was created. *See* Webster Complaint, *passim*.

31.    The Webster Complaint appears to allege the loans made by WCP, to DRL and 423 Kennedy, to be "involved" in a partnership between Messrs. Huertas and Paret. *Id.* at ¶ 45.

32.    The Webster Complaint further alleges that Mr. Huertas "used" DRL "to purchase foreclosed properties" belonging to the putative partnership between Messrs. Huertas and Paret. *Id.* at ¶ 46.

33.    The Webster Complaint asks this Honorable Court to impose a constructive trust on the assets of the putative partnership (which would seemingly include either the DRL Notes and 423 Kennedy Notes or, based upon how one construes the Webster Complaint, potentially the DRL Property and the 423 Kennedy Property). *Id.* at pp. 17-20.

34.    It genuinely appears that Mr. Webster, a seasoned Chapter 7 trustee is, upon the performance of due diligence and conducting of some variety of an investigation, alleging that he—in his capacity as Mr. Paret's trustee—owns some combination of the promissory notes, deeds of trusts, and real estate assets at issue in litigation involving DRL and 423 Kennedy.

35.    Mr. Webster's beliefs appear to be rooted in those of Mr. Paret himself who, upon questioning under oath, has indicated that he believes his partnership with Mr. Huertas owns DRL and 423 Kennedy or, at minimum, the debt instruments upon which those entities are obligated and/or the real estate assets held by those entities.

### f. Removal of Litigation

36.    Within two days of the docketing of the Webster Complaint, WCP and its co-defendants caused the then-consolidated litigation involving DRL and 423 Kennedy to be removed to this Honorable Court on July 4, 2024. *See Developer RE1 LLC, et al. v. WCP Fund I LLC, et al.*, Case No. 24-10023 (Bankr. D.D.C. 2024) (the "Consolidated Litigation").

37.    The Consolidated Litigation was removed to this Honorable Court *before* JPK became a debtor in bankruptcy.

38.    The Consolidated Litigation was removed by filing an appropriate notice in the Paret Main Case, and is docketed as being associated with the Paret Main Case, though WCP and its co-defendants therein, together with JPK, certainly maintain the Consolidated Litigation to also bear significantly on the bankruptcy of JPK.

### g. Posture of Consolidated Litigation at Time of Removal

39.    At the time the Consolidated Litigation was removed, SNL had recently been joined as a party.

40.    DRL had waited until March 7, 2024 to join SNL to the litigation through the filing of an amended complaint, despite SNL having held one of the at-issue promissory notes, and having been the beneficiary of the one of the at-issue deeds of trust, since *prior* to the litigation's commencement.

41.    Upon being joined, SNL filed a motion to dismiss, which was still pending at the time of removal (and which remains pending as of present).

42.    SNL's motion to dismiss urges JPK is a necessary party to the Consolidated Litigation.

43.     Insofar as SNL still had a motion to dismiss pending at the time of removal, SNL had not yet had occasion to take any discovery in the case.

44.     While certain deposition notices were issued in the Consolidated Litigation, the day before removal, an accompanying e-mail from counsel for DRL and 423 Kennedy also indicated, *inter alia*, "I do not expect these depositions to go forward on the dates and times noted, but rather to serve as placeholders given that we have to re-coordinate the scheduling of depositions that we previously planned to accomplish before the 7/9/24 close of discovery."

45.     Though a trial date was putatively set in the Consolidated Litigation, for early September 2024, no pre-trial conference had been scheduled by the Superior Court, no deadlines for motions in limine had been established, dispositive motions were yet to be filed, SNL was yet to file an answer (much less take discovery), and JPK had yet to be joined as a party (much less file a pleading or take discovery); it was highly unlikely—if not logistically impossible—for the then-scheduled trial date to be honored.

### h. Filing of Involuntary Bankruptcy

46.     On July 23, 2024, Shaheen Sariri ("Mr. Sariri") filed an involuntary bankruptcy petition against JPK, thereby commencing the above-captioned bankruptcy proceeding.

47.     Mr. Sariri is the individual from whom JPK borrowed $50,000.00 to fund JPK's operations, and Mr. Sariri has correctly observed that JPK defaulted under the terms of the correlative promissory note.

48.     JPK became aware of the filing of the involuntary petition when Mr. Sariri's counsel notified JPK's pre-bankruptcy counsel of such shortly after the petition was docketed.

49.     While JPK was aware Mr. Sariri may file an involuntary bankruptcy petition, and certainly welcomed such a filing, JPK was *not* privy to the exact date and time at which the petition

would be docketed, nor did JPK have certain knowledge such a petition would be docketed until the filing actually occurred.

50.     Following the docketing of the involuntary petition, JPK promptly engaged Jeffrey Orenstein, Esq. ("Mr. Orenstein"), a bankruptcy attorney with whom JPK had formerly consulted more than a month *after* JPK was first formed.

51.     Mr. Orenstein was *not* consulted by JPK, WCP, SNL, or any related person or party, prior to the formation of JPK and did not advise WCP and/or SNL in connection with the formation of JPK.

52.     Had an involuntary bankruptcy not been filed against JPK, it is likely JPK would have filed a voluntary petition for Chapter 11 relief.

53.     Though no resolution was ever formally drafted or executed, JPK did, at all times from at least July 4, 2024 forward, have the requisite support amongst its members and manager to file for bankruptcy relief.

### III.     Argument: This is Not a Bad Faith Bankruptcy

Dozens of times each year, this Honorable Court is confronted with the Chapter 11 case of a single asset real estate entity facing imminent foreclosure. For better or worse, such cases— alongside closely-related proceedings concerning single asset landlords committed to Superior Court receivership—form a vibrant majority of the local Chapter 11 docket. Yet, with a few particularly-colorful exceptions normally involving the outright forging of documents, these matters are scantly—if ever—challenged as bad faith filings, even when a debtor has acquired real estate with the proceeds of a short term loan and promptly defaulted thereupon. Of course a single asset real estate entity is permitted to seek bankruptcy relief; Section 362 of the Bankruptcy Code even provides special provisions for the temporal obligations of such debtors. So it necessarily

comes as something of a surprise for the UST to now suggest that a lender—holding not one, but three separate loans, made to three separate entities—ought not be permitted access to the same reorganizational toolbox.

The heart of the Motion, aside from an attack on the allegedly-collusive nature of the involuntary petition herein (which is addressed in detail below), is a contention that JPK's formation in temporal proximity to the bankruptcy filing is, *ipso facto*, disqualifying of an entitlement to seek bankruptcy relief. The UST posits JPK has "no legitimate business operation to reorganize," Motion, DE #37, at p. 14, that the case is a part of an "orchestrated . . . guise," *id.*, and that permitting JPK to reorganize would be "an abuse of the purposes of the Bankruptcy Code," *id*. In so contending, the UST—notably without ever invoking the actual verbiage—appears to take aim at so-called "Texas Two Step" bankruptcies, suggesting an entity enmeshed in potentially-costly litigation ought not be permitted to spin off the impacted assets into a new company that will likely avail itself of bankruptcy protection. Yet case law is plain that such a maneuver is entirely permissible, no matter the standard applied. While certain such cases have failed and been found to be exercises in bad faith, the failures have never been attributable to the corporate divestiture or a young entity not being permitted entry into bankruptcy court; the failures, rather, have almost always been idiosyncratically tied to either the financial health of the petitioning debtors or the mere existence of a two-party dispute.

Identifying the appropriate standard, however, is somewhat more difficult. It has been 32 years since this Honorable Court spoke to the standard requisite to dismiss a Chapter 11 case as a bad faith filing, in the context of a published opinion; the at-issue opinion—*Franklin Mortgage*—is neither a district nor circuit-level holding and predates the recent wave of Third and Fourth Circuit holdings addressing fact patterns more analogous to that instantly manifest. So while

review of JPK's case under the *Franklin Mortgage* standard is most certainly addressed herein, this brief will first address the more modern holdings of nearby circuits that appear more temporally influential than a one-off opinion released by Judge Teel the day before Michael Jordan, Larry Bird, and David Robinson led the "Dream Team" to victory over Germany in the group stage of the Barcelona Olympics.

### a. Adoption of the Fourth Circuit Standard Would Require the Motion be Denied

Just last year, the Fourth Circuit reaffirmed a longstanding and well-settled doctrine providing that in order for a Chapter 11 case to be dismissed on bad faith grounds, "the complaining party must show both 'subjective bad faith' and the 'objective futility of any possible reorganization.'" *Bestwall*, 71 F.4th at 182 (quoting *LTL I*, 64 F.4th at 98 n.8 (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989))). In so holding, the appellate court addressed the case of an entity formed pursuant to a so-called "Texas Two Step" for the transparent purposes of abiding a divisional merger counterparty's "desire to pursue its non-asbestos-related business apart from asbestos-related litigation or a bankruptcy proceeding while keeping its assets available to satisfy any asbestos-related liabilities, if required." *Bestwall*, 71 F.4th at 183.

*Bestwall* may actually be the precedent most analogous to the instant case. While JPK certainly is not in the asbestos business, and is not being actively accused of contributing to tens of thousands of deaths and chronic illnesses, JPK is being accused of being the byproduct of a transaction aimed at allowing a spun off entity, holding troubled assets, to avail itself of the jurisdictional protections of the Bankruptcy Code. In *Bestwall*, creditors asserted such an effort to be improper, urging asbestos litigation to belong in the courts in which it was commenced and to be outside the purview of the bankruptcy court. *Id.* at 180 ("The Claimant Representatives also assert that Old GP impermissibly sought to manufacture jurisdiction in the bankruptcy court which

13

could prevent this Court from exercising 'related to' jurisdiction. We disagree with the Claimant

Representatives' argument and the dissent's acceptance of that argument.").

The Fourth Circuit, confronted with this strenuous argument as to the propriety of

garnering bankruptcy jurisdiction through a strategic corporate split, roundly rejected the notion

by observing bankruptcy jurisdiction to have been available to the original, pre-merger entity and

to have simply passed, through the corporate split, to the new company:

> . . . Old GP, New GP, and Bestwall did not manufacture jurisdiction via their Texas
> divisional merger. This is evident because without the restructuring, the asbestos
> claims would have remained with Old GP. And, if Old GP had filed for bankruptcy,
> the bankruptcy court would have had jurisdiction over those claims as it does over
> the same claims here.
>
> Thus, as Bestwall and New GP point out, "the corporate restructuring leaves the
> jurisdictional result the *same*."

*Id.* at 181 (citing 28 U.S.C. § 1334(b); *U.S.I. Props. Corp. v. M.D. Constr. Co*., 860 F.2d 1, 6 (1st

Cir. 1988)) (internal citation omitted) (emphasis in original).

This is a critical point insofar as it appears to undermine the UST's working theory of this

case. The Motion posits the instant bankruptcy to be a ". . . clearly a manufactured attempt to have

additional grounds to remove the Superior Court litigation to a perceived friendlier forum."

Motion, DE #37, at p. 13. Yet this contention misses that (i) the Consolidated Litigation was

removed to this Honorable Court when Mr. Webster filed his amended complaint in the Paret case,

*before* the JPK bankruptcy filing occurred; and (ii) WCP or SNL could have removed the

14

Consolidated Litigation to this Honorable Court had either entity itself filed for bankruptcy protection, as highlighted by the *Bestwall* Court.[3]

Indeed, as in *Bestwall*, jurisdiction in this Honorable Court was not *manufactured*, even in the absence of the Webster Complaint; jurisdiction that was invokable by both WCP and SNL was merely passed to JPK through capitalization of the new entity with the transfer of promissory notes bearing alleged *in rem* liability. When JPK received putatively troubled assets from its two equity holders, JPK received, too, the jurisdictional rights and entitlements that come with holding putatively troubled assets. These rights and entitlements flowed with the promissory notes in a manner no different than the correlative deeds of trust or the rights to be paid by the obligors thereunder; the jurisdictional rights and entitlements cannot be severed from the assets to which they attach and, accordingly, necessarily pass with ownership.

### i.   This Case is Not Objectively Futile

Using the *Bestwall* test, the first conjunctive rigor of a bad faith finding is objective futility. This prong traces back to *Carolin Corp.*, where the Fourth Circuit observed that ". . . even if subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found." *Carolin Corp*. 886 F.2d at 701.

Here, the JPK bankruptcy is most certainly not objectively futile. The Debtor holds three promissory notes: an unsecured note for $50,000.00 and two secured notes that total over $2.3 million. While JPK's debt to Mr. Sariri is not disputed, the Debtor's *in rem* obligations on the two

---

[3] Though not a material part of the analysis herein, the UST's comment about a perceptively "friendlier" court does merit brief attention: WCP has won matters, lost matters, and settled matters in this Honorable Court, just as WCP has won, lost and settled matters in the District of Columbia Superior Court. Neither venue is perceived to be "friendlier" than the other, though there is an abiding belief this Honorable Court—just as with every other bankruptcy court in America—has greater expertise on the fine points of the law governing commercial debtor/creditor secured transactions.

secured notes are heavily disputed. If JPK prevails *at all* in the Consolidated Litigation, JPK will be able to pay all of its debts in cash and/or kind, emerging from Chapter 11 as a healthy company.

Moreover, and without seeking to prematurely adjudicate the merits, *vel non*, of the Consolidated Litigation, there is good reason to believe JPK will both be joined therein and prevail. DRL and 423 Kennedy are seeking relief against the notes held by JPK and have obtained an injunction that binds JPK; no great legal stretch is needed to surmise that JPK is a necessary party to the case and will, in turn, be either joined or permitted to intervene. And once JPK is properly a party thereto, the merits certainly appear to bode well for JPK: DRL and 423 Kennedy do not dispute failing to pay the at-issue promissory notes at maturity, nor do they seem to dispute having failed to make numerous interest payments in a timely fashion, nor do they seem to dispute that their failure to pay taxes and other municipal obligations caused senior liens to accrue upon their respective properties in contravention of the deeds of trust. DRL and 423 Kennedy are certainly welcome to continue to argue that these breaches were too slight to give rise to defaults, and that the terms of commercial debt instruments should be construed with the same borrower-friendly allowances as those of consumer debt instruments. But it is genuinely difficult to posit that DRL and 423 Kennedy have so great a chance of ultimately succeeding on these contentions as to leave JPK, in turn, with liabilities that wholly exceed the value of JPK's assets and thereby render JPK unable to reorganize.

JPK needs only a modest return on the two secured notes to successfully emerge from bankruptcy; the unsecured note will, in time, produce a return of both principal and interest capable of getting JPK on the proverbial right foot. So while JPK certainly believes it is entitled to every single dollar of the secured notes to DRL and 423 Kennedy, the conservative reality is that if JPK were to collect only $100,000.00—a sum less than 1/23 the scheduled value of those assets—JPK

would, in turn, be comfortably able to pay all claims in full and successfully reorganize with a so-called "100% plan."

### ii.  This Case is Not a Byproduct of Subjective Bad Faith

Insofar as there can be no finding of objective futility, analysis of subjective bad faith is immaterial given the conjunctive nature of the two prongs of the *Bestwall* test. *See, e.g.*, *In re Aldrich Pump LLC*, 2023 Bankr. LEXIS 3043, at *64 (Bankr. W.D.N.C. Dec. 28, 2023) (". . . a Chapter 11 case may be dismissed as a bad faith filing only when the bankruptcy reorganization is <u>both</u> (i) objectively futile and (ii) filed in subjective bad faith.") (emphasis in original).  Yet even if inquiry were made into this realm, the facts *sub judice* certainly do not evidence subjective bad faith, instead pointing to an honest lending company that is seeking to reorganize in the court that is so frequently called upon to lend aid to lenders' counterparties in their hours of greatest need.

The Fourth Circuit has explained, of the subjective bad faith standard, that the rigor's aim is to:

> . . . determine whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities."

*Carolin Corp.*, 886 F.2d at 702 (quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983)).

If the emphasis on an intent or ability to actually reorganize appears redundant to the inquiry focused on objective futility, such is neither coincidence nor folly: "Evidence of subjective bad faith in filing may tend to prove objective futility, and *vice versa*. Indeed it could be that some of the courts ostensibly holding that dismissal is warranted upon a finding of either have considered that proof of either implicitly proves both." *Carolin Corp.*, 886 F.2d at 701.

JPK most certainly has both an intent and an ability to reorganize its financial activities, as discussed above. Equally tellingly, however, the JPK bankruptcy has not occasioned any hardship or delay to putative creditors through the automatic stay, as evidenced by a review of each creditor's respective claim and its surrounding circumstances.

Concerning Mr. Sariri, the bankruptcy most certainly cannot be viewed as having been commenced to cause him hardship or delay, insofar as he is the individual who commenced the bankruptcy. He has filed a brief in opposition to the Motion, DE #48, and suffice it to posit his interests are best served through the reorganization of JPK.

Concerning DRL and 423 Kennedy, the JPK bankruptcy has not caused either entity to experience any hardship or delay for various reasons. First, the Consolidated Litigation was removed *before* the JPK bankruptcy was filed; whatever delay was occasioned by removal was already occasioned before JPK was deemed an alleged debtor, much less subject to an actual order for relief.[4] Second, as discussed above, the state court phase of the Consolidated Litigation could not have actually proceeded to trial in early September 2024; SNL had just been added to the case and still had a motion to dismiss pending, no pre-trial conference had been scheduled (let alone a pretrial order with trial deadlines entered), no deadline for motions in limine had been established, and the plaintiffs' own counsel was acknowledging—via e-mail—that he did not even intend to conduct depositions before the then-scheduled close of discovery. And, third, by virtue of the Consolidated Litigation being removed before JPK was even a debtor, the automatic stay never came into play; the Consolidated Litigation is an adversary proceeding that continues to proceed

---

[4] It bears notation that removal most likely did not cause any ultimate delay and, rather, almost assuredly invites a prompter adjudication of the Consolidated Litigation. As discussed *passim*, it was almost impossible—if not actually impossible—for the scheduled trial date to be honored. Once reset, this Honorable Court's docket would be far more accommodating of a new, prompt trial date than the docket of the Superior Court.

in this Honorable Court. In fact, the most notable delay in the Consolidated Litigation has been occasioned by the plaintiffs' motion to remand the proceeding back to Superior Court, not by any effort to JPK to stall forward movement through invocation of the automatic stay.

### iii.   This Court Should Adopt the *Bestwall* Standard

Familiarly, that this Honorable Court is surrounded by the Fourth Circuit, much as the Vatican is surrounded by Rome, does not render this Honorable Court subject to Fourth Circuit precedent. And one need not look beyond questions of corporate small business debtors receiving a discharge from liabilities that would otherwise hang like an anvil around the neck of a natural persons, or of a bankruptcy court's ability to entertain moot proceedings devoid of a case or controversy, to find fertile ground to question the Fourth Circuit's guidance on emerging hot button insolvency issues. But the line of cases commenced with *Carolin* and following through *Bestwall* stands in necessary distinction to these more infamous pronouncements for the simple reason that the policy rationale is both compelling and sound. While adoption of *any* of the standards discussed herein would result in the Motion being denied, it does seem the *Bestwall* standard is that best suited for the District of Columbia Circuit.

Core to *Carolin* and *Bestwall* is the requirement that a case be both objectively futile *and* brought in subjective bad faith for dismissal to be granted on bad faith grounds. There is a compelling bankruptcy-centric rationale for this two-pronged rigor:

> Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk the wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in prejudging its futility at the threshold. We believe that such a stringent test is necessary to accommodate the various and conflicting interests of debtors, creditors, and the courts that are at stake in deciding whether to deny threshold access to Chapter 11 proceedings for want of good faith in filing.

19

*Carolin Corp.*, 886 F.2d at 701. *See also Coleman v. Cmty. Tr. Bank (In re Coleman)*, 426 F.3d 719, 727 (4th Cir. 2005) (reaffirming the policy rationale).

This case exemplifies the soundness of the Fourth Circuit's reasoning. Where, as here, a motion to dismiss on bad faith grounds is lodged at the outset of a case, suspicions and innuendo have a tendency to supplant facts and reality. A challenge to plan confirmation can be rooted in the provisions of a plan of reorganization and the record established during a bankruptcy case's pendency; an out-of-the-gate motion to dismiss is rooted in little more than raw speculation, so often fomented by the creditor(s) most angered by a debtor's election to invoke Chapter 11 protections in the first instance.

Here, the UST filed the Motion without even conducting a meeting of creditors or reviewing schedules. The Motion posits JPK has only a single creditor, Motion, DE #37, at p. 13, when the barest examination of thereafter-filed scheduled shows at least three creditors to be extant. The UST also accused Mr. Orenstein of ethical violations and fraud in coordinating the JPK bankruptcy when, in fact, he did not so much as know of JPK's existence until *after* it was created. And the UST believes this case exists to facilitate the removal of the Consolidated Litigation when, in reality, the Consolidated Litigation was removed *before* this case was ever filed.

While these factual issues can be resolved through motions practice, as they will be herein, the errors portend poorly for the quality of any crystal ball through which the UST may claim to gaze in judging the reorganizational likelihood of JPK. At least one creditor is so vehemently in favor of Chapter 11 as to have filed an involuntary petition; the Debtor is, too, sufficiently content to reorganize as to have consented to entry of an order for relief; and equity, through this briefing, makes clear its similar support for the Chapter 11 process.

*Carolin*, *Bestwall*, and *Coleman* seemingly contemplate this very situation: if there exists conflict amongst interested parties, and so much as a colorable possibility of a debtor succeeding in reorganizing through Chapter 11, why should such efforts be stymied at the behest of those interested parties who wish otherwise? If there is a cognizable path forward, why should aspersions cast in the earliest days of a case prematurely doom that path? Parties in interest will have the full cadre of arguments available at the time of confirmation and, especially in a Subchapter V case such as this, that time is not too far into the future; assuredly a debtor deserves at least the opportunity to enshrine a theory of reorganization into the body of a plan and permit that plan to be balloted.

And if this Honorable Court were to hold otherwise, finding that futility is immaterial and the bad faith evidenced by a weaponization of the automatic stay is alone sufficient to render a case ripe for dismissal, that aforementioned steady stream of single asset filings would assuredly be jeopardized in the process. After all, nearly every such entity seeks bankruptcy protection just hours before a foreclosure is to be carried out, just as nearly every landlord plagued by a receivership order seeks safe haven on the eve of an ominous Superior Court hearing.

### b. Adoption of the Third Circuit Standard Would Also Require the Motion be Denied

In two intimately-related—and much-analyzed—cases, the Third Circuit has recently had occasion to establish (and then refine) its position on Texas Two Step bankruptcies. From a conglomerate no less ubiquitous than Johnson & Johnson has come *LTL I* and *LTL II*, the cases addressing that blue chip entity's efforts to spin off talc-centric liabilities through a divisional merger and then place the resulting entity in Chapter 11. And while both efforts have failed, the reasoning behind such failures is of particular import, as the Third Circuit has crafted a standard

that might keep one particular debtor out of bankruptcy but that, if applied to the instant case, would assuredly permit JPK to reorganize.

In creating LTL Management, "J&J's stated goal was to isolate the talc liabilities in a new subsidiary so that entity could file for Chapter 11 without subjecting Old Consumer's entire operating enterprise to bankruptcy proceedings." *LTL I*, 64 F.4th at 93. The divisional merger was accomplished in October 2021, *id.* at 95, with a bankruptcy filing ensuing a scant two days later, *id.* at 97.

In addressing the ensuing motion to dismiss LTL's first bankruptcy on bad faith grounds, the Third Circuit found a two prong inquiry to control:

> "[T]wo inquiries . . . are particularly relevant": "(1) whether the petition serves a valid bankruptcy purpose[;] and (2) whether [it] is filed merely to obtain a tactical litigation advantage." Valid bankruptcy purposes include "preserv[ing] a going concern" or "maximiz[ing] the value of the debtor's estate." Further, a valid bankruptcy purpose "assumes a debtor in financial distress."

*LTL I*, 64 F.4th at 100-01 (quoting *15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119-20 (3d Cir. 2004));[5] *Integrated Telecom*, 384 F.3d at 128).

The problem in *LTL I* was not that the debtor was formed two days before seeking bankruptcy relief, or even that the debtor was holding assets alleged to have contributed to the death of thousands of people. The problem, rather, was the funding agreement underlying the divisional merger at the heart of LTL's inception: the debtor had "roughly $61.5 billion" in assets and, as such, did not suffer from the scantest of financial distress. *LTL I*, 64 F.4th at 108. Indeed,

---

[5] This is not a typographical error; "NMSBPCSLDHB, L.P." is the actual name of the lead party to the cited case.

". . . LTL, at the time of its filing, was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future." *Id.*

The Third Circuit did, however, expressly address the propriety of the transaction that created LTL: "No one doubts that the state-law divisional merger passed talc liabilities to LTL. Why in bankruptcy would we recognize the effectiveness of this state-law transaction, but at the same time ignore others that augment LTL's assets, such as its birth gift of the Funding Agreement?" *Id.* at 105.

Stated otherwise, that LTL was created with the intent of entering bankruptcy in 48 hours was not—and is not—an issue. Indeed, the Third Circuit even ". . . recognize[d] the Code contemplates 'the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation.'" *LTL I*, 64 F.4th at 102 (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999)). Rather, that LTL had $61.5 billion of assets, and no cognizable liabilities that would cause that enormous liquid reserve to be depleted, was the problem.

Notably, however, even that concern would be walked back somewhat by the Third Circuit in *LTL II*. There, after seeing its first bankruptcy dismissed, LTL restructured its funding agreement so the company would only have access to a meager $30 billion. *LTL II*, 2024 U.S. App. LEXIS 18437, at *7. And while the Third Circuit found this was still far too much available cash for a debtor that did not face litigation posing an existential threat or a realistic prospect of inviting a liability in excess of this amount, the court did nonetheless hedge its previous ruling: "when future insolvency is a realistic possibility based on meaningful evidence—not just the result of a highly speculative 'worst-case' scenario—a mass-tort defendant has a viable case for bankruptcy." *Id.* at *14.

23

With this foundation, the United States District Court for the District of Delaware reaffirmed, less than two months ago, that ". . . a company need not wait 'until after a massive judgment has been entered against it' before filing for bankruptcy." *Emp. v. AIG Fin. Prods. Corp. (In re AIG Fin. Prods. Corp.)*, 2024 U.S. Dist. LEXIS 155142, at *25 (D. Del. Aug. 28, 2024) (citing *SGL*, 200 F.3d at 164). The *EMP* holding—from a court within the Third Circuit, on the heels of the two LTL cases—is particularly noteworthy, as it reaffirms not merely that a solvent debtor can seek bankruptcy protection when confronted with ominous litigation but, too, that seeking to combine the expenses of litigation defense with the expenses of bankruptcy administration can be fodder sufficient to establish a "valid reorganizational purpose" sufficient to overcome allegations of bad faith, *id.* at *28, even if the bankruptcy is otherwise motivated by efforts to "obtain tactical advantages" in ongoing litigation, *id.* at *30.

JPK, of course, does not have $61.5 billion, or even $30 billion. JPK has $950.00 in a checking account and a little over $20,000 in a lawyer's trust account (with that sum, no doubt, being certain to be setoff primarily, if not *en toto*, by administrative expenses correlative to defending the UST's Motion and earlier objection to the employment of counsel). JPK is assuredly not highly solvent with cash. In fact, JPK is facing litigation seeking *in rem* relief that, if afforded, would decimate the two largest assets of JPK and leave JPK without any realistic prospects of being able to pay its debts or operate on a go-forward basis.

So, unlike in *LTL I* and *LTL II*, the Debtor here is not flush with cash. And unlike in those cases, the Debtor here is already facing litigation that poses an existential risk; there is not merely a highly-speculative concern that such litigation might be filed years down the road. Rather, JPK enters bankruptcy with a "valid reorganizational purpose:" resolving the Consolidated Litigation

in a manner that permits JPK to foreclose on its collateral and apply the proceeds thereof to the retirement of debts in accord with the priority scheme established by the Bankruptcy Code.

Just as this Honorable Court is not in the Fourth Circuit, this Honorable Court is, too, not in the Third Circuit. Yet even if the *LTL* standard were applied, this case would not meet the criteria of being a bad faith filing and the Motion would merit denial.

### c. A Totality of Circumstances Analysis Would Also Require the Motion be Denied

The UST advocates for yet another standard in assessing bad faith: "totality of the circumstances." Motion, DE #37, at pp. 12-13. In so doing, the UST asserts this to have been the standard recently applied in what appears to be an oral ruling in a *sui generis* case where, notably, bad faith was not found to be present. *Id.* This is also the test adopted by this Honorable Court during the aforementioned Barcelona Olympiad, when a dormant District of Columbia company was suddenly quit-claimed a Florida real estate asset so as to dirty the chain of title and frustrate efforts to record a pocket deed. *Franklin Mortg. & Inv. Co.*, 143 B.R. at 297.

The "totality of the circumstances" test is an eight prong, disjunctive analysis used to assess the motivations of a debtor entering Chapter 11:

[1.] The debtor has one asset, such as a tract of undeveloped or developed real property.

[2.] The secured creditors' liens encumber this tract.

[3.] There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or make adequate protection payments . . . .

[4.] Typically, there are only a few, if any, unsecured creditors whose claims are relatively small.

[5.] The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation . . . .

25

[6.] Bankruptcy offers the only possibility of forestalling loss of the property.

[7.] There are sometimes allegations of wrongdoing by the debtor or its principals.

[8.] The 'new debtor syndrome,' in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies . . . bad faith cases.

*Franklin Mortg. & Inv. Co.*, 143 B.R. at 299-300 (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986); *Duggan v. Highland-First Ave. Corp.*, 25 B.R. 955, 961 (Bankr. C.D. Cal. 1982)). *Compare Franklin Mortg. & Inv. Co.*, 143 B.R. at 299-300 *with Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995) (showing the *Franklin Mortgage* factors to be largely—albeit not entirely—the same as those used by another court applying the "totality of the circumstances" test).

Here, JPK does not have just one asset; the Debtor has three assets of note, all of which are promissory notes and none of which are real estate assets (though two of the notes are secured by real estate assets). So the first prong of the totality of the circumstances test is plainly not satisfied.

Similarly, this is not a case where there are any secured creditors (except to the extent DRL and 423 Kennedy have *in rem* relief against two of the three promissory notes). So it cannot be said that any liens are encumbering any tracts of land owned by JPK; to the contrary, it is the liens of JPK that encumber tracts of land (and the improvements thereupon) owned by third parties.

As for the third prong, there is very much an available stream of cash that can be used to sustain a plan of reorganization: as soon as JPK can foreclose on the deeds of trust securing two of the three promissory notes, JPK will have access to monies to pay creditors. Similarly, JPK will have additional cash flow when the unsecured promissory note comes due. These are funds that JPK can use to make payments in accord with the governing priority scheme, to reorganize, and to assess potential future lending opportunities as a reorganized debtor.

Concerning the fourth criterion, this is not a case involving small claims. DRL and 423 Kennedy are asserting *in rem* claims valued at more than $2 million. Even Mr. Sariri is seeking north of $50,000.00, which is a noteworthy sum of money in the prism of a Subchapter V bankruptcy proceeding.

The fifth prong also militates against a finding of bad faith. Not only is there no property to be foreclosed in this case, but the Consolidated Litigation is not between JPK and "one creditor." There are, rather, two distinct entities making claims against JPK's assets; the two entities may share common counsel, and a common principal, but are backed by separate investors, own property at separate locations, have different construction-centric aspirations, and have gone out of their way—in myriad court filings—to insist they are absolutely *not* affiliates of one another.[6]

The sixth consideration is, likewise, resolved in favor of the Debtor. Bankruptcy is not the sole means through which JPK can forestall a loss of property; JPK can defend the Consolidated Litigation in any venue and avail itself of all the due process rights associated with being joined to the proceeding and contesting the legally-errant theories of the two plaintiffs.

As for the seventh factor, there are not actually allegations of wrongdoing against JPK (aside from having the temerity to embrace Chapter 11). The allegations of wrongdoing against JPK's two members are, as discussed above, tenuous and legally-troubled. DRL and 423 Kennedy are trying to impose consumer lending standards on commercial transactions and suggesting a commercial lender is not only forbade from declaring defaults upon late payments and the accrual

---

[6] Lest this point appear contextually obtuse: DRL, 423 Kennedy, and a third entity under common control, are all cognizant that relevant loan documents provide a default by one affiliate constitutes a default by related affiliates. DRL and 423 Kennedy are not in a position to deny each other's defaults, let alone to deny the defaults of a third related entity, so they have steadily insisted that they are not actually affiliates. The point is largely immaterial given the abundance of other defaults under the at-issue loan documents, but it is one that does prove meritorious in showing the creditors in this case are well estopped from suggesting the existence of a two-party dispute.

of senior liens but, indeed, engages in acts of tortious interference by making such declarations. These may well suffice as "allegations" of wrongdoing, but it is difficult to credit them as much more.

Finally, this is also not a case where there is so-called "new debtor syndrome," since JPK plainly fails the qualifying test of being a "a one-asset entity." *Franklin Mortg. & Inv. Co.*, 143 B.R. at 300.

Indeed, *none* of the *Franklin Mortgage* factors weigh in favor of finding this case to be a bad faith bankruptcy filing, saving and excepting the legally-troubled allegations of wrongdoing on the part of JPK's equity interests. To the contrary, the "totality of the circumstances" test reveals only that JPK does not fall into any of the notable categories traditionally encompassing bad faith debtors and, rather, presents as the variety of debtor whose Chapter 11 case ought not raise concerns at the outset.

### d.  The UST's Cited Case Law in Inapposite

Surprisingly, the UST does not analyze *Franklin Mortgage*, *Carolin*, *Bestwall*, or even *LTL* in its Motion, despite the latter three cases having consumed copious ink in bankruptcy publications of late and the former case being the topical published precedent of this Honorable Court. The UST, rather, focuses on an amalgamation of inapposite cases, having minimal—if any—applicability to the matter *sub judice*.

The Motion first topically invokes *In re HBA E., Inc*., 87 B.R. 248 (Bankr. E.D.N.Y. 1988), a notably older case from a more geographically-remote circuit. The facts underlying *HBA* are sufficiently complex that there were "disagreements . . . so pervasive that the parties even dispute their disagreements." *Id.* at 251. Yet the core holding, finding bad faith to be extant, turned on the debtors' inability to reorganize: "The history of the Debtors, disputes regarding the ownership and

control of their assets, and the absence of funding from outside sources support the conclusion that these Debtors have no realistic chance of successfully reorganizing." *Id.* at 261.

The ability to reorganize is, no doubt, important to *any* Chapter 11 case. And it is on that basis that the United States District Court for the District of Delaware has distinguished *HBA* on at least one occasion. *See In re Sgl Carbon Corp.*, 233 B.R. 285, 290 (D. Del. 1999) ("Unlike the Debtor in this case, the debtors in HBA East were one man businesses, were never self-sufficient operations, had no legitimate assets and no realistic chance of reorganization."). By contrast, and as noted *passim*, JPK most certainly appears to have the ability to reorganize.

The UST also relies on the Eleventh Circuit's holding, from 1989, in the matter of *In re Dixie Broad., Inc.*, 871 F.2d 1023 (11th Cir. 1989). Yet that case involved a bankruptcy petition filed during a literal state court lunchbreak, with aims of allowing a debtor to avoid honoring its obligations under one sales contract in favor of a more lucrative later-signed sales contract. *Id.* at 1026-27. *Dixie Broad.* also featured a debtor that admitted to not being in financial distress, *id.*, and that had used a complex security agreement arrangement to frustrate the purchase rights of a contractual counterparty, *id.*

Perhaps most tellingly about *Dixie Broad.*, however, is the ruling: the Eleventh Circuit expressly found the degree of bad faith requisite to lift the automatic stay is *not* synonymous with the bad faith requisite to dismiss a Chapter 11 case, and dismissed the appeal to the extent creditors sought to have the underlying bankruptcy case dismissed. So even with those particularly troubling facts, the Eleventh Circuit did not see grounds sufficient to have a bankruptcy case dismissed.

Most surprising of the UST's citations, however, is *In re Crown Fin.*, 183 B.R. 719 (Bankr. M.D.N.C. 1995). Coming from a court within the Fourth Circuit, temporally between *Carolin* and *Bestwall*, this case simply reaffirms that dismissal for bad faith requires ". . . that both objective

futility and subjective bad faith be shown. . ." *Id.* at 721. Under *Crown Fin.*, if ". . . there is any going concern value to preserve on the part of the debtor and any realistic possibility of an effective reorganization," dismissal must be denied. *Id.* at 722.

Given that JPK plainly has value as a going concern, and is very well situated to successfully reorganize, it is unclear why the UST would rely on *Crown Fin.* in support of dismissal. Yet, as discussed *supra*, WCP certainly joins in any effort of the UST seeking to have this Honorable Court embrace the Fourth Circuit standard from *Carolin* and *Bestwall* that is reinforced through *Crown Fin.*

### e.  Amicable Involuntary Filings are Not Bad Faith Proceedings

The Motion also suggests bad faith to be afoot because the involuntary petition underlying this case was not overtly hostile and unwelcomed in nature. The UST's theory of bad faith on this point is plainly errant, however, insofar as there is no question but that JPK could very well have filed its own voluntary petition for bankruptcy relief. While there may be some circumstances where an involuntary petition gives rise to suspicion when a debtor is otherwise subject to a bar order forbidding a successive bankruptcy filing, or subject to so-called "bankruptcy remote" provisions in loan documents, this case does not nearly present any such fact pattern. The involuntary petition calls attention to the fact that JPK's creditor base is not solely comprised of DRL and 423 Kennedy, and shows at least one creditor with a bona fide claim is in favor of reorganization, but is otherwise a red herring.

The law governing "friendly" or "coordinated" involuntary cases is neatly divisible into two categories: (i) those instances where a debtor legally cannot seek bankruptcy relief on its own; and (ii) those instances where a debtor legally *can* seek bankruptcy relief on its own. There does not appear to be any precedent holding the latter variety of cases (which would most closely mirror

the matter *sub judice*) to be bad faith filings. The former category of cases, perhaps surprisingly, presents an eclectic mix, with there not being any brightline rule of such circumstances equating to bad faith and, instead, with case-specific facts being the operative focus of inquiry.

Judge Brozman's ruling in *Kingston* demonstrates the marked permissibility of coordinated involuntary filings, even where a case falls into the aforementioned category of being one where a debtor cannot itself docket a petition for relief. There, a series of "bankruptcy remote provisions" in loan documents prohibited a group of debtors from seeking to reorganize under Chapter 11, *Kingston*, 214 B.R. at 714, so a law firm was paid to "solicit creditors to file involuntary . . . petitions," *id.*

When the *Kingston* filings were, inevitably, challenged as being the instrumentalities of collusive bad faith, Judge Brozman held:

> I conclude that although the debtors plainly orchestrated the filing of the involuntary petitions, they had reason to believe that reorganization was possible and did not circumvent any court-ordered or statutory restrictions on bankruptcy filings such that, absent any evidence of objective futility of the reorganization process, the cases ought not be dismissed now.

*Id.* at 714-715. Critical to this holding was a distinction drawn separating *Kingston* from cited collusive cases where a debtor had been judicially barred from seeking to reorganize:

> In each of these cases, a debtor attempted to bypass a statutory or court-imposed restriction on filing a new bankruptcy case by arranging the filings of involuntary cases with friendly creditors. Consonant with the definition of collusion, these cases contain (i) secret acts and (ii) a fraudulent purpose. The Movants ask me to extrapolate a rule from these cases that a debtor-induced filing per se leads to a finding of bad faith, which in turn constitutes cause for dismissing these chapter 11 cases. I decline to announce so broad a rule.

*Id.* at 733. *See also In re Mi La Sul*, 380 B.R. 546, 556 (Bankr. C.D. Cal. 2007) (". . . a case started in a collusive fashion can be saved if the court finds that reorganization is possible and the case passes the 'nose test.'").

To be sure, and as acknowledged by Judge Brozman in *Kingston*, there are plenty of cases where an otherwise-ineligible debtor sought to gin up an involuntary petition, so as to end-run a bar order, and those are frequently found to be bad faith filings. But even assuming every allegation of the UST instantly, such is very much not the case vis a vis JPK. Quite plainly, JPK could have filed a Chapter 11 petition on its own and, equally plainly, JPK is eligible to be a debtor in this Honorable Court. In fact, JPK did not even confront the obstacle of the debtors in *Kingston*, where loan provisions effectively stymied the docketing of a voluntary petition—the UST does not allege that JPK lacked the requisite support of members and/or directors to reorganize; the UST merely alleges that JPK sought to have a third party formally commence the reorganization process.

Key to *Kingston* and *Mi La Sul* is the notion that an allegedly collusive involuntary filing becomes permissible if reorganization is feasible. As discussed *passim*, reorganization is plentifully feasible *sub judice*.

### IV.   Argument: The Debtor is Not Required to Carry Insurance or, Alternatively, the Absence of Insurance is Due to Unusual Circumstances

Finally, the UST seeks dismissal because of a failure to (i) file schedules; (ii) file an initial monthly operating report; and (iii) carry insurance. The former two issues have been remedied, with the delays being correlative to the UST's own objection to the Debtor being permitted to engage counsel. The latter requirement is inapplicable to JPK, which holds only promissory notes and cash as its assets. To the extent the UST endeavors to compel JPK to insure the assets securing two of those promissory notes (which are assets held by adverse third parties), the "special circumstances" allowance of the Bankruptcy Code assuredly excuses compliance *sub judice*.

Section 1112 of the Bankruptcy Code permits dismissal for "cause," with one enumerated ground being "failure to maintain appropriate insurance that poses a risk to the estate or to the public. . ." 11 U.S.C. § 1112(b)(4)(C). As noted by a leading treatise, "[t]he level and types of

insurance that similar businesses would ordinarily carry outside of a bankruptcy case is a relevant

factor in determining whether appropriate insurance is being provided by the debtor in possession."

7 Collier on Bankruptcy P 1112.04

Here, JPK does not hold any insurable assets (aside from a small amount of cash that no

one disputes to be subject to the insurance of the Federal Deposit Insurance Corporation). JPK

holds only promissory notes, two of which are secured by deeds of trust. Promissory notes, by

their very nature, do not create attractive nuisances, are not subject to casualty, and do not invite

the risk of insurable liability. It is genuinely unclear if any reputable insurer would even underwrite

a policy for a promissory note in the first place.

More importantly, though, a loss of the promissory notes would not occasion any risk to

the estate or the public. There is a sound legal mechanism for replacing promissory notes when

literally lost, enshrined in the District of Columbia Code. *See* D.C. Code § 28:3-309. And, equally,

the loss of a promissory note is incapable of causing any harm to the public; none of the citizenry

risks injury or economic detriment if a lender misplaces a promissory note.

To the extent the UST is instead focused on the real estate securing the two promissory

notes, it bears emphasis that such real estate is not an asset of JPK's bankruptcy estate. The real

estate, rather, belongs to DRL and 423 Kennedy, respectively. Both entities are required to insure

the real estate pursuant to deeds of trust securing the notes. To the extent the entities are in default

of this requirement, JPK's remedy would be to foreclose on account of said defaults. Yet, with no

small hint of irony, JPK is presently enjoined from foreclosing on account of the Consolidated

Litigation that gives rise to JPK's need to reorganize in bankruptcy. Fed. R. Civ. P. 65(d)(d)(C).

WCP has made inquiry of DRL and 423 Kennedy's counsel concerning insurance and is

informed that general liability insurance is held by both entities. Counsel has also indicated that

additional insurance can be obtained if necessary, and it is reasonably believed such will occur before a hearing on the Motion. However, should such not occur, and should this Honorable Court find (i) JPK is bound to have the real estate insured, even though JPK does not own the real estate; and (ii) such is otherwise "cause" under Section 1112, then JPK would certainly be well justified in seeking to have the injunction dissolved so that it may promptly proceed to foreclose the two assets, thereby curing the issue "within a reasonable period of time. . ." 11 U.S.C. § 1112(b)(2)(B).

**V.    Conclusion**

WHEREFORE, WCP respectfully prays this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

*[Verification, Signature and Certificate of Service on Following Page]*

34

Respectfully submitted,

Dated: October 14, 2024          By:   /s/ Maurice B. VerStandig
                                       Maurice B. VerStandig, Esq.
                                       Bar No. MD18071
                                       The VerStandig Law Firm, LLC
                                       9812 Falls Road, #114-160
                                       Potomac, Maryland 20854
                                       Phone: (301) 444-4600
                                       mac@mbvesq.com
                                       *Counsel for WCP Fund I LLC*


## **VERIFICATION**

I declare under penalty of perjury that the factual allegations set forth in Section II of the foregoing opposition brief are true and correct, though I claim no personal knowledge of the legal analogy set forth in paragraph 18 of Section II.


10/14/2024                             Signed by:
_____                       *Daniel Huertas*
Dated                                  ──5DB7DC969DB344C...
                                       Daniel Huertas
                                       Authorized Agent
                                       WCP Fund I LLC


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of October, 2024, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being sent to all parties receiving electronic notice herein including, *inter alia*, counsel for the United States Trustee.

                                       /s/ Maurice B. VerStandig
                                       Maurice B. VerStandig